UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| ERIE INSURANCE COMPANY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2: 24-124-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| TIFFANY WORKS, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On June 4, 2023, twenty-month-old Layla Eastman ("Eastman") drowned in Defendant Tiffany Works' ("Works") outdoor swimming pool while under her foster care. This litigation ensued thereafter.[1] Two issues are currently pending for consideration. First, should the Court exercise jurisdiction under the Declaratory Judgment Act. Second, if the Court exercises jurisdiction under the act, is Works covered by either of two insurance policies issued by Plaintiff Erie Insurance Company ("Erie").[2] These questions are presented in a motion to dismiss filed by Works [Record No. 25], and Erie's motion for summary judgment. [Record No. 15] After fully considering the matter, the undersigned concludes that exercise of jurisdiction is proper and a factual issue is presented regarding one of the subject policies which cannot be resolved through summary judgment. As a result, Works' motion to dismiss

---

[1]   The present action is derivative of a matter pending in the Kenton Circuit Court. *See Estate of Layla Eastman, et al., v. Cabinet for Health and Family Services, et al.,* Civil Action No. 24-CI-110 (hereafter, the "underlying action").

[2]   Works holds a homeowner's policy and an umbrella policy with Erie.

will be denied, and Erie's motion for summary judgment will be granted, in part, and denied, in part.

I.

On June 1, 2022, ten-month-old Layla Eastman and her two-year-old brother were temporarily placed in the custody of the Kentucky Cabinet for Health and Family Services ("CHFS") while their parents were "provided with services".[3] [Record No. 25-1, ¶ 16] "The goal was to return [Eastman] and her brother to … their parents, as soon as possible." [*Id.*] Initially, the children were placed with a two parent foster family with no other children in the home. [*Id.*, ¶ 16] However, when the couple discovered they were expecting a child of their own, they were no longer able to provide Eastman and her brother the attention they needed. Thereafter, on February 3, 2023, Eastman and her brother were transferred to the home of Defendant Tiffany Works. [*Id.*, ¶ 21; Record No. 15-3] Prior to this placement, Eastman and her brother visited their biological parents in their home each week. [*Id.*, ¶ 20]

Works provided foster care for two other children in addition to Eastman and her brother. [*Id.*, ¶ 23] In February of 2023, Eastman's parents expressed concerns their children were permitted to "'run wild at the foster home[.]'" [*Id.*, ¶ 25] About a month later, Eastman's parents "were transitioning to the return of their children to their custody with each having unsupervised parenting time and obtaining furnishings for the children to return home." [*Id.*,

---

[3]  In addressing the motion to dismiss under Rule 12(6) of the Federal Rules of Civil Procedure, the Court takes the facts as alleged in the Complaint, drawing all reasonable inferences in the nonmoving party's favor. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). In analyzing the motion for summary judgment, the facts are viewed in the light most favorable to the non-moving party. The undersigned does not look beyond the pleadings to resolve the 12(b)(6) motion. However, the Court looks beyond the pleadings when addressing the motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

¶ 28] On May 23, 2023, CHFS employees noted that Works' "'home always smells like urine, due to multiple dogs'" and that Eastman "was not doing well in day care[.]" [*Id.*, ¶ 31]

Works' home had an uncovered outdoor above ground pool, accessible by walking outside onto a wooden deck, which led directly to the pool's edge. [*Id.*, ¶ 22] On June 4, an unsupervised Eastman left a bedroom in Works' home and wandered outside into the swimming pool. [*Id.*, ¶¶ 33-34] At least an hour later, Works discovered that the child had drowned. [*Id.*] Later that day, Eastman's brother was removed from the home and returned to his parents. [*Id.*, ¶ 36][4]

Around June 3, 2024, Eastman's parents filed the underlying action against Works and others alleging negligence, gross negligence, and negligence *per se*. [Record No. 15-1, p. 2] At the time of Eastman's death, "Works was the named insured on an ErieSecure Home Insurance Policy … for the period of March 13, 2023 through March 13, 2024 … [and] Works was also the named insured under a Personal Umbrella Policy … for the same policy period." [*Id.*, pp. 2-3]

## II.

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court makes all reasonable inferences in favor of the non-moving party, the plaintiff must plead factual content that allows the court to draw the

---

[4] The Kenton County Family Court formally returned Eastman's brother to his parents' custody on July 11, 2024. [*Id.*, ¶ 37]

reasonable inference that the defendant is liable for the conduct alleged. *Id.* (citing *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 556 (2007)).

### III.

The Declaratory Judgment Act provides, in relevant part, that:

> [A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). To evaluate whether jurisdiction is exercised appropriately under the Declaratory Judgment Act, the Court weighs the following factors outlined in *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019) (quoting *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)).

Works argues that the Court should decline to exercise jurisdiction in this case because, *inter alia*, "[t]his action will not settle the ultimate controversy currently pending in the underlying state court litigation nor will it clarify the legal relationships at issue[.]" Further, Works contends that ruling on this case "will require an interpretation and application of … state statutes and administrative regulations, … interpretation of a state-created contractual agreement between Works and the Cabinet for Health and Family Services, [and] will result

in an increase in friction between the federal and state court and encroach upon state jurisdiction." [Record No. 25, pp. 1-2]

#### a.

The first factor favors the exercise of jurisdiction. "This is not a case where an insurance company brings a federal declaratory judgment action to clarify the scope of its policy despite the fact that the company is a party to a state-court lawsuit that will settle that very issue." *Scottsdale Ins. Co. v. Alley Trucking, LLC*, 2012 WL 13028143, at *2 (E.D. Ky. Nov. 9, 2012). Here, the question of whether Erie is required to indemnify or defend Works under either policy is not contested in the underlying action. Instead, the underlying action focuses on the liability of Works and several other defendants for Layla Eastman's death. Thus, a declaratory judgment settles the controversy "because it resolves the dispute between the insurer and insured over who will pay for the state-court litigation." *Cole's Place, Inc.*, 936 F.3d at 397.

#### b.

The next factor considers whether a declaratory judgment serves a useful purpose in clarifying the legal relations in issue. *Grand Trunk*, 746 F.2d at 326. "In general, courts tend to consider this factor with the first factor, reaching the same conclusion for both." *Mass. Bay Ins. Co. v. Christian Funeral Dirs., Inc.*, 759 F. App'x 431, 438 (6th Cir. 2018). Here, a declaratory judgment solely dictates whether Erie's policies cover the events giving rise to the underlying litigation. And because the determination "squarely clarifies that relation[,]" the second Grand Trunk factor also favors the exercise of jurisdiction. *See id.*

**c.**

The third guidepost asks whether facts indicate there is a "race" for res judicata. In the matter at hand, there are no facts to suggest this is the case, especially because this inquiry turns on courts' "dim view of declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum." *AmSouth Bank v. Dale*, 386 F.3d 763, 788 (6th Cir. 2004). Here, the underlying action was filed by Eastman's parents on June 3, 2024, and the present case was filed almost two months later (July 26, 2024).

**d.**

In *Scottsdale Ins. Co. v. Roumph*, the Sixth Circuit further explained the fourth *Grand Trunk* factor (*i.e.*, friction between federal and state courts and potential encroachment on state jurisdiction) to include the following considerations:

> 1. whether the underlying factual issues are important to an informed resolution of the case;
> 2. whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
> 3. whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

211 F.3d 964, 968 (6th Cir. 2000).

The first subfactor weighs in favor of jurisdiction because the dispute regarding liability does not bear on the Court's interpretation of the insurance policies. Instead, Eastman's parents, CHFS, the foster care agency and others dispute who and to what extent the parties are responsible for Eastman's death. Thus, the Court is not required to make factual findings that would overlap with the underlying action, because liability for Eastman's death and Erie's coverage are two separate issues.

Next, the state court was not asked to determine the extent of Works' coverage under the policies. Therefore, the second subfactor carries no weight. The state court is certainly entitled to deference regarding facts necessary to determine "the relationships between the parties, the duties of each [d]efendant as it relates to those relationships and the state statutes and regulations pertaining to the provision of foster care for children in the care and custody of [CHFS.]" [Record No. 25, p. 21] However, that inquiry is distinct from the coverage issues presented in this action. And as explained below, this Court does not address a "previously undetermined question of state law." *See Roumph*, 211 F.3d 964, 969 (quoting *Omaha Property & Casualty Ins. Co. v. Johnson*, 923 F.2d 446, 448 (6th Cir.1991)); *see also Cole's Place*, 936 F.3d at 400. It merely addresses a fresh set of facts that warrant a *factual* inquiry into "residence." Thus, this Court can sufficiently resolve the Kentucky insurance interpretation issues at hand fairly without overstepping the traditional bounds of federalism. *See* 211 F.3d at 969.

Finally, while Kentucky common law governs the interpretation of both insurance contracts, this subfactor does not alone establish friction between federal and state courts. *See Cole's Place*, 936 F.3d at 401 ("[A]lthough we do not agree that this subfactor affirmatively supports jurisdiction, we find that it is neutral and does not weigh heavily in the balance."). In summary, two of the three subfactors favor the exercise of jurisdiction.

e.

Finally, Kentucky provides a procedure for a declaration of rights. *Bituminous Cas. Corp. v. J & L Lumber Co.*, 373 F.3d 807, 816 (6th Cir. 2004). In Kentucky, "the plaintiff may ask for a declaration of rights, either alone or with other relief; and the court may make a

binding declaration of rights, whether or not consequential relief is or could be asked." KRS § 418.040. "Another possible remedy is for the federal declaratory plaintiff to file an indemnity action at the conclusion of the state action." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 562 (6th Cir. 2008). This factor weighs against a decision to exercise jurisdiction. "However, given that Kentucky precedent provides clear guidance as to the resolution of the legal issue presented, it cannot be said that … [this] court [i]s a clearly inferior forum to resolve the issue." *Id.*

Because four of the five *Grand Trunk* factors support the Court's exercise of jurisdiction under the Declaratory Judgment Act, the Court will deny Works' motion to dismiss and proceed to evaluate Erie's motion for summary judgment.

**IV.**

Summary judgment is appropriate when the moving party shows that there is no genuine dispute regarding any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To meet that standard, a movant must show that the nonmoving party has failed to produce evidence to support at least one essential element of his or her claim. *See Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted)).

Once the moving party has satisfied this burden, the opposing party must set forth specific facts showing that there is a genuine issue for trial. *McLaughlin v. Fifth Third Bank, Inc.*, 772 F. App'x 300, 302 (6th Cir. 2019) (citing Fed. R. Civ. P. 56(e)). In other words, the nonmoving party must present "significant probative evidence that establishes more than some

metaphysical doubt as to the material facts." *Golden v. Mirabile Invest. Corp.*, 724 F. App'x 441, 445 (6th Cir. 2018) (citation and alteration omitted).

In evaluating motions seeking summary judgment, the Court views the "evidence in the light most favorable to the nonmoving party." *Lang v. City of Kalamazoo*, 744 F. App'x 282, 285 (6th Cir. 2018) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). However, the undersigned may not weigh the evidence or make credibility determinations but must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. at 251–52 (1986). *See also Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). And under the Declaratory Judgment Act, the district court declares the rights and legal relations of the interested parties. *See Nationwide Mut. Fire Ins. Co. v. Creech*, 431 F.Supp.2d 710, 712-13 (E.D. Ky. 2006).

## V.

Under Kentucky law, the interpretation and construction of an insurance contract is a matter of law for the Court. *Kemper Nat. Ins. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky. 2002). Further, an insurance contract should be read "according to its plain meaning, its true character and purpose, and the intent of the policies." *Liberty Corporate Capital Ltd. v. Security Safe Outlet, Inc.*, 937 F. Supp. 2d 891, 898 (E.D. Ky. 2013). And when the language of an insurance contract is ambiguous or self-contradictory, it is construed *in favor of the insured*. *Id.* at 897 (citing *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859-60 (Ky. 1992)). However, the Court will not create an ambiguity where there is none so that it may resolve a dispute in the insured's favor. *See id.* at 898.

Finally, "[w]hen analyzing challenged terms for clarity … the terms of insurance contracts have no technical legal meanings and must be reasonably interpreted as they would be understood by a lay reader." *Thomas v. State Farm Fire & Cas. Co.*, 626 S.W.3d 504, 507 (Ky. 2021). In the present matter, the parties dispute whether Works is covered under a homeowner's policy, and an umbrella policy. As explained further below, Works is not covered under the homeowner's policy; however, there is a genuine dispute of material fact concerning her coverage or lack thereof under the umbrella policy.

## VI.

### The Homeowner's Policy

Works is not entitled to coverage for the underlying action under the homeowner's policy because Layla Eastman was a "resident" under the policy's definition, and she was in Works' "care" during the relevant period. The "home and family liability protection" section of the homeowner's policy provides, in relevant part:

> OUR PROMISE - Bodily Injury Liability Coverage And Property Damage Liability Coverage
>
> "We" will pay all sums up to the amount shown on the "Declarations" which "anyone we protect" becomes legally obligated to pay as damages because of "bodily injury" or "property damage" caused by an "occurrence" during the policy period. "We" will pay for only "bodily injury" or "property damage" covered by this policy.
>
> "We" may investigate or settle any claim or suit for damages against "anyone we protect," at "our" expense. If "anyone we protect" is sued for damages because of "bodily injury" or "property damage" covered by this policy, "we" will provide a defense with a lawyer "we" choose, even if the allegations are not true. "We" are not obligated to pay any claim or judgment or defend any suit if "we" have already used up the amount of insurance by paying a judgment or settlement.

[Record No. 1-5, p. 25]

The policy also states that "**[b]odily injury**" means physical harm, sickness or disease, including mental anguish or resulting death[;] …"**[o]ccurrence**" means an accident, including continuous or repeated exposure to the same general harmful conditions[;] … [and] "**[y]ou**," "**your**" or "**Named Insured**" means the person(s) named on the "Declarations" under "Named Insured." Initially, Erie concedes that: (1) Works qualifies as "you" under the policy; (2) Eastman's death constitutes a "bodily injury; and (3) Eastman's death was an "occurrence." Beyond these concessions, the parties' interpretations diverge substantially.

**Exclusion 12:**

Erie contends the following exclusion bars Works' coverage under the homeowner's policy:

> EXCLUSIONS - What We Do Not Cover
> ***
> "We" do not cover under **Bodily Injury Liability Coverage**, Property Damage Liability Coverage, Personal Injury Liability Coverage and Medical Payments To Others Coverage:
> ***
> "**[B]odily injury**" or "personal injury" to "you" and if "**residents**" of "your" household, "your" relatives, and persons under the age of 21 in "your" **care** or in the care of "your" "resident" relatives.

[Record No. 1-5, pp. 26; 28 (emphasis added)]

Application of this exclusion presents two questions: (1) was Eastman a "resident"; and (2) was Eastman under Works' "care" at the time of her death. While "resident" is defined, "care" is not. The policy defines "resident" as, in relevant part, "*a person who physically lives with 'you' in 'your' household.*" [Record No. 1-5, p. 10] Under this definition, Eastman was a resident, because Eastman lived with Works in the household during the time period Works was insured.

Because the policy provides no definition of "care," the Court defers to its plain meaning absent an applicable definition in Kentucky case law. Merriam-Webster's online dictionary defines care as "responsibility for or attention to health, well-being, and safety." In the present case, Works was "responsible for" Eastman, even without untangling the web of legal relationships at issue in the underlying action. And Kentucky case law confirms this understanding of the plain meaning of "care."

In *Thomas v. State Farm Fire & Cas. Co.*, 626 S.W.3d 504, 507 (Ky. 2021), the Supreme Court of Kentucky extended a policy exclusion that precluded coverage of "bodily injury to any person who is in the care of any insured" to a situation involving a childcare services business in which a child was purportedly intentionally harmed by the caretaker. Here, Works was a full-time foster parent, which provides a stronger basis for the proposition she "cared" for Eastman in contrast to the role of a day-care provider. And while Kentucky courts have addressed the definition of care more specifically in the realm of *property*, such cases are inapplicable to the facts presented here. *See, e.g., Ronalco, Inc. v. Home Ins. Co.*, 606 S.W.2d 160, 161 (Ky. 1980) (insurance coverage of damaged furnace); *W. Am. Ins. Co. v. Prewitt*, 401 F. Supp. 2d 781, 789 (E.D. Ky. 2005) (coverage concerning beached sailboat), *aff'd.* 208 F. App'x 393 (6th Cir. 2006).

While Works' arguments may have warranted a closer inquiry had the insurance policy used "custody" or "legal guardianship," the Court is satisfied that the plain meaning of "care" and the Kentucky Supreme Court's implicit endorsement of the definition in *Thomas* fully encompass Works' role as a foster parent, triggering the exclusion. Thus, the homeowner's policy does not cover her in the underlying action.

**The Umbrella Policy**

While the homeowner's policy excludes coverage, a question of material fact exists regarding whether the umbrella policy covers Works because "resident" is a question of fact under Kentucky law. The "Liability Protection" section of the umbrella policy provides the following:

> "We" will pay the "ultimate net loss," up to the limit of liability shown on the "Declarations," which "anyone we protect" becomes legally obligated to pay as damages because of "bodily injury," "property damage" or "personal injury" caused by an "occurrence" during the policy period. "We" will pay for only "bodily injury," "property damage" or "personal injury" covered by this policy. This applies only to damages in excess of the "underlying insurance" or "self-insured retention."
>
> ***
>
> "We" will defend "anyone we protect" at "our" expense with attorneys of "our" choice if: 1. "anyone we protect" is sued for damages covered by this policy, even if the allegations are groundless, false or fraudulent[.]

[Record No. 15-6, pp. 8-9]

**Exclusion 12**

Similar to the homeowner's policy, the umbrella policy contains an exclusion providing that "'[w]e' do not cover … 'bodily injury' or 'personal injury' to 'you' and, if **residents** of 'your' household, 'your' 'relatives' and persons under the age of 21 in 'your' care or in the care of 'your' 'relatives.'" [*Id.*, pp. 9; 11 (emphasis added).] But unlike the homeowner's policy, the umbrella policy does not define "resident". This creates a separate quandary. Merriam Webster's online dictionary defines "resident" as "one who resides in a place." It further defines "reside" as "to dwell permanently or continuously**:** occupy a place as one's legal domicile." Initially, this definition appears straightforward. But what is a legal domicile? And did twenty-month-old Layla Eastman intend to dwell "permanently or continuously" with Works?

In *Perry v. Motorists Mut. Ins. Co.*, 860 S.W.2d 762 (Ky. 1993), the Supreme Court of Kentucky held that "[r]esidency and intent are questions of fact and not of law where the evidence supports more than one inference upon which reasonable minds may differ." *Id.* at 764. The Court faced a novel scenario in which a newlywed couple died in a car crash twelve hours after their wedding.

> [T]hree to four weeks prior to the marriage, [the bride,] Christian[,] stayed in the home of [the groom] Pete's aunt in Pleasureville where Pete was also temporarily residing. Although the evidence indicates that Christian initially intended to stay only one night, she extended her visit until the wedding day. During that period she returned to her father's house to pick up additional belongings but at the time of her death, approximately 90 percent of her belongings were still at her father's house according to his testimony. Christian kept her key to her father's house which remained her mailing address. The evidence indicates that the living arrangements for the newlyweds had not been settled at the time of their tragic deaths.

*Id.* The *Perry* Court determined that "[l]egal residency is based on fact and intention." *Id.* And "[i]ntent, where different inferences can be drawn from undisputed facts, is a question of fact and not of law." *Id.* at 765. *See also Bratcher v. State Farm Fire & Cas. Co.*, 642 S.W.3d 724, 727 (Ky. Ct. App. 2021) ("[T]here is a genuine issue of material fact as to whether Kristina qualifies as a *resident* relative under the policy.") (emphasis added).

Here, the issue of Eastman's residency is a close question. First, because Works is a foster parent, Eastman's placement in her home was never intended to be permanent. Next, Eastman's biological parents were unsatisfied with the conditions in Works' home and were working towards regaining custody. [*See* Record No. 25-3, ¶ 12.] Further, they retained supervision of their other child placed with Works (Eastman's older brother) the day of their daughter's death, which was barely over four months from their children's initial placement with Works. Under *Perry's* holding, the Court cannot conclude as a matter of law that the

exclusion, which turns on "residency" "clearly includes Eastman." [*Contra* Record No. 10, p. 9]

However, Erie offers two cases that merit discussion regarding this issue. It argues that the court in *West Am. Ins. Co. v. Embry*, 2005 WL 1026185 at *3 (W.D.Ky. 2005), was able to determine the residency of an eleven-year-old boy who lived in the defendant's household for five to seven weeks. But the decision in *Embry* only mentioned residency in a footnote and it explicitly disclaimed, "[t]he [c]ourt does not conclusively decide this issue [of residency] since it has no facts on record from Defendant." *Id.* at *6, n.3.

Erie also cites *State Farm Mut. Auto. Ins. Co. v. Marley*, 151 S.W.3d 33, 36 (Ky. 2004), in support of its argument that "[a]n umbrella policy must be considered in accordance with the nature of the claims that it is called on to cover as an 'extension' of the underlying policy it is intended to supplement". Under this view, the umbrella policy could automatically adopt the definition of residency in the homeowner's policy. But *Marley* presented an antithetical scenario. There, Kentucky's highest court voided an umbrella policy's household exclusion on public policy grounds, forcing the insurance company to cover the claimant. Here, the Court acknowledges a potentially expansive view of Works' umbrella policy with Erie exists because "residency" was undefined. Thus, in summary the undersigned concludes that exclusion 12 does not apply as a matter of law. Instead, Works' coverage under the policy will depend on resolution of the factual question of whether Eastman was "a resident" on her date of death.

### Exclusion 17

Prepared for the contingency that Eastman was a "resident," Erie marshals a barrage of ancillary exclusions. It contends that exclusion 17 disclaims coverage for "'bodily injury' or 'personal injury' to 'anyone we protect' or other person(s) who reside on the 'residence

- 15 -

premises,' except a 'residence employee.' [Record No. 15-6, p. 11] However, "one who resides" is just "resident" in a nonexistent disguise. And Erie's own argument in favor of this exclusion is that "Eastman clearly was a resident of Works' home[.]" [Record No. 15-1, p. 10]

Because Eastman may not have been a "resident" during the relevant period, exclusion 17 is similarly inapplicable.

## Exclusion 9

Erie next argues that exclusion 9 bars coverage because Works failed to "render professional services" the day Eastman passed. The exclusion encompasses:

> "bodily injury," "property damage" or "personal injury" arising out of the rendering or failing to render professional services. Professional services include, but are not limited to:
> a. any architectural, engineering or industrial design services;
> b. any medical, surgical, dental or other services contributing to the health of persons or animals;
> c. any beauty or barber services;
> d. any legal, accounting or insurance services;
> e. the servicing, installation or maintenance of computer hardware or software;
> f. the selling, designing, licensing, consultation, franchising, furnishing or creation of computer hardware or software, including electronic data processing programs, designs, specifications, manuals or instructions.

[Record No. 15-6, p. 10]

This exclusion does not apply because Works did not fail to provide professional services. Erie does not explain how this exclusion applies, but ostensibly, it could be pertinent due to Works' failure to provide medical services to Eastman. However, Works is not a medical professional, and no exclusions exist concerning a failure to diligently provide "care" or child supervisory-related services (assuming such a clause would even apply to foster parenting).

- 16 -

**Exclusion 10**

Finally, Erie asserts that Works' role as a foster parent was a "business" activity for the purposes of exclusion 10. The policy defines "business" as "any full-time, part-time or occasional activity engaged in as a trade, profession or occupation, including farming." [Record No. 15-6, p. 7] This argument fails, however, because foster parenting is not a "trade, profession, or occupation."

The policy excludes all coverage stemming from:

> "bodily injury," "property damage" or "personal injury" arising out of "business" pursuits or "business property" of "anyone we protect." This includes regular "business" activities or "business" activities for which a person is required to be licensed by the state, and "personal injury" caused by "anyone we protect" arising out of the use of an unmanned aerial vehicle.

[*Id.*, p. 10] Erie's contention that Works' was conducting business does not satisfy Kentucky's definition of a "business pursuit." For Works' activity "[t]o constitute a business pursuit, there must be two elements; first, continuity, and secondly, the profit motive[.]" *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859 (Ky. 1992). But foster parents do not "profit." They receive a non-taxable stipend for taking care of the children placed in their homes, specifically, a "reimbursement". [*See* Record No. 25-3, ¶ 17; Record No. 25-8, p. 2 ¶ 2(f).]

**VII.**

Based on the foregoing analysis and discussion, it is hereby **ORDERED** as follows:

1. Defendant Tiffany Works' Motion to Dismiss [Record No. 25] is **DENIED**.

2. Plaintiff Erie Insurance Company's Motion for Declaratory Judgment [Record No. 15] is **GRANTED**, in part, and **DENIED**, in part consistent with this Memorandum Opinion and Order.

3. The Court finds and declares that Plaintiff Erie Insurance Company does not owe Defendant Tiffany Works a duty to indemnity or to defend the defendant from or regarding the allegations and claims made in the civil action pending in the Commonwealth of Kentucky styled, *Estate of Layla Eastman, et al. v. Cabinet for Health and Family Services, et al.*, Civil Action No. 24-CI-1101 **under the homeowner's policy**.

Dated: March 4, 2025.



Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky